IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 21, 2016 Session

IN RE D.R.S.

Appeal from the Juvenile Court for Loudon County
No. 2015-JV-145    Henry E. Sledge, Judge

_____

No. E2015-01991-COA-R3-PT-FILED-AUGUST 29, 2016
_____

This is a termination of parental rights case. The Department of Children's Services filed a petition to terminate the parental rights of J.R.S. (Mother) and J.R.S.[1] (Father) with respect to their child, D.R.S. (the Child). The trial court found clear and convincing evidence of four grounds supporting termination of the rights of each parent. The court also found, by the same standard of evidence, that termination is in the best interest of the Child. Mother and Father appeal. We affirm as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed as Modified; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, JJ., joined.

Brian Z. Schott, Maryville, Tennessee, for the appellant, J.R.S. (Mother).

Ian P. McCabe, Knoxville, Tennessee, for the appellant, J.R.S. (Father).

Herbert H. Slatery III, Attorney General and Reporter, and Alexander S. Rieger, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

OPINION

I.

The Child was born on June 13, 2011. Mother and Father married in or around 2012. The trial court entered an emergency protective custody order on December 16,

_____

[1] Both parents have the same initials.

2013, providing for the removal of the Child from Mother. The order placed the Child in the custody of the State. Mother had tested positive for methamphetamine and was arrested December 12 on charges related to possession and manufacturing of methamphetamines. She later admitted to using methamphetamines almost daily for three years and as recently as three days prior to her December 12 arrest. When the Child was removed, Father was incarcerated, serving a sentence for the promotion and manufacture of methamphetamines. As to both parents, the court adjudicated the Child dependent and neglected. Each parent stipulated that the Child was dependent and neglected. The trial court ratified the first permanency plan on January 14, 2014. The goal of the plan was reunification.

Mother was incarcerated until April 3, 2014, at which time she was placed in an inpatient drug rehabilitation program. She participated in the program for about nine months, completing two of its four treatment phases. On December 30, 2014, she chose to leave the program before beginning the third phase of treatment. She spent the next several days using illegal drugs. She turned herself in to authorities on January 16, 2015, and was again incarcerated. Father was released from confinement about a month after the Child was placed in State custody. Initially he took steps to work with DCS, but then without warning, stopped communicating with it in April 2014. He did not resume communications until February 2015. During that time, he traveled to Virginia, staying "here and there." Father was incarcerated from September to December 2014.

DCS filed a petition on March 27, 2015, to terminate the parents' parental rights. The Department sought termination on four grounds – abandonment by failure to provide a suitable home, pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) (2014) and -102(1)(A)(ii) (2014); abandonment by an incarcerated parent, pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and -102(1)(A)(iv), (B)-(E); substantial noncompliance with a permanency plan, pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2) (2014); and persistence of conditions, pursuant to Tenn. Code Ann. § 36-1-113(g)(3). Following a trial, the court entered an order finding clear and convincing evidence to terminate each parent's parental rights to the Child on each of the four grounds. By the same standard of evidence, the trial court also found that termination was in the Child's best interest. Mother and Father appeal.

## II.

Mother raises the following seven issues on appeal, which we quote verbatim from her brief:

Whether grounds for abandonment must be set aside as DCS failed to show that Mother signed and received a copy of the Criteria and Procedures for Termination of Parental Rights pursuant to Tenn. Code Ann. § 37-2-403.

Whether Mother's actions after the removal of her child show[ ] that Mother made reasonable efforts to provide a suitable home for her daughter and show[ ] concern for her daughter's welfare.

Whether Mother willfully failed to visit or willfully failed to support her daughter during the four (4) months preceding her incarceration.

Whether Mother's only relapse after completing [nine] months at a rehabilitation program demonstrates a wanton disregard for her daughter's welfare.

Whether Mother was in substantial noncompliance with the statement of responsibilities in her permanency plan.

Whether Mother's actions demonstrate that the reason for removal of her daughter will be remedied at an early date to allow for the safe return of her daughter.

Whether it is in [the Child's] best interest to terminate Mother's parental rights.

(Numbering in original omitted.) Father raises the following issues on appeal, which we again quote verbatim:

Whether the trial court's clear and convincing determination that [DCS's] petition for termination against Father was in error?

A. The lower court's holding that Father "abandoned" his child pursuant to [Tenn. Code Ann.] §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii) should be reversed in light of Father's "reasonable efforts[.]"

3

B. The lower court's finding that Father was in "substantial non-compliance" with the permanency plan pursuant to [Tenn. Code Ann.] §§ 36-1-113(g)(2), 37-2-403(a)(2) as well as "persistent conditions" pursuant to [Tenn. Code Ann.] § 36-1-113(g)(3) should be reversed due to Father's established progress towards the goals of the plan.

C. The lower court's finding of "wanton disregard" regarding the Father's actions in the four (4) consecutive months immediately preceding the filing of the Department's petition for termination of parental rights pursuant to [Tenn. Code Ann.] § 36-1-113(g)(1) and 36-1-102(1)(a)(iv) was in error[.]

Whether the trial court's clear and convincing finding that [DCS's] petition for termination against Father was in the "best interest" of the [C]hild, pursuant to [Tenn. Code Ann.] § 36-1-113(i)?

(Capitalization and paragraph numbering in original omitted.)

### III.

A parent has a fundamental right, based on both the federal and state constitutions, to the care, custody, and control of his or her child. *Stanley v. Ill.*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996). While this right is fundamental, it is not absolute. The State may interfere with a parent's rights in certain circumstances. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court conducts a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interest[ ] analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App., filed June 26, 2006).

We are required to review all of the trial court's findings with respect to grounds and best interest. *In re Carrington*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest[ ], regardless of whether the parent challenges these findings on appeal.")

The Supreme Court has recently delineated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate

5

parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*Id.* at 523-24 (internal citations omitted). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *4 (Tenn. Ct. App., filed Oct. 30, 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV.

On appeal, Mother argues that DCS "failed to show proof that it provided [her] with the criteria and procedures for termination of parental rights." As a result, she asserts that DCS "should not be allowed to proceed on any of the alleged grounds of abandonment." Citing *In re C.L.H. et al.*, No. M2000-02799-COA-R3-PT, 2001 WL 605101 (Tenn. Ct. App., filed June 5, 2001), she argues that DCS's failure to establish it gave the notice required by Tenn. Code Ann. § 37-2-403 precludes the Department from terminating her rights due to abandonment.

Mother states in her brief that she never received or signed the "criteria and procedures for terminating parental rights." A copy of the document appears in the record and was entered as an exhibit at trial. Unlike Father, Mother did not sign the final page of the document, which states "I have received a copy of the <u>Criteria & Procedures for Termination of Parental Rights</u> and have been given an explanation of its contents." (Underling in original; emphasis removed.) The signature block reserved for Mother is blank. However, DCS family service worker Kelley Cooper expressed, by her signature on the same document, that she "explained the contents of this document" to Mother and Father on January 7 and 3, 2014, respectively. The trial court held three separate hearings on the permanency plans and entered three permanency hearing orders – on January 14, June 17, and December 9, 2014. Each order recites that the court found the criteria and procedures for termination of parental rights was provided to Mother.

Mother's attorney, by his signature, approved each order for entry.[2] At the trial of the issue of termination, DCS moved to enter into evidence the three permanency hearing orders as part of a collective exhibit. Mother's counsel responded that he had "[n]o objection." Mother's counsel attended all of the hearings related to the plans. Mother attended the second hearing by phone and the third hearing in person. She did not attend the first hearing due to her incarceration.

After reviewing the trial transcripts, as well as the pleadings and exhibits in the record, we have found no indication that Mother raised this issue before the trial court. Furthermore, the record suggests that Mother was aware of the criteria and procedures. In any event, Mother has waived her right to raise this issue on appeal by not raising it with the trial court. *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983).

## V.

In her brief, Mother raises the issue of whether DCS proved that she willfully failed to visit or willfully failed to support the Child during the four months immediately preceding her incarceration. As DCS points out in its brief, the termination order entered by the trial court does not make a finding pertaining to whether Mother or Father failed to visit or failed to support. In its original petition in this matter, DCS asserted the ground of "abandonment by [an] incarcerated parent." In support of its position, DCS claimed that both parents had "willful[ly] failed to make reasonable payments toward the [C]hild's support," that Mother had failed to make more than token visitation with the Child, and that both parents acted with a wanton disregard for the Child's welfare. The trial court, in considering the ground of "Abandonment – By Incarceration," made a finding only as to whether the parents "engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the [C]hild." Therefore, we will not address as separate grounds the issues of abandonment by failure to visit or support. However, we will consider, as the trial court did, each parent's visitation and support payments, or lack thereof, where appropriate in determining whether termination has been established on other grounds or is in the Child's best interest.

---

[2] The first two permanency hearing orders were approved for entry by Mother's former counsel. The third order, dated December 9, 2014, was signed "approved for entry" by Mother's current counsel.

7

## VI.

## A.

The trial court found clear and convincing evidence that both parents abandoned the Child by failing to provide a suitable home. As to Father, the trial court found that he was incarcerated when the Child was taken into custody and, thus, was not then providing a suitable home. Father was released from incarceration about a month later, on January 10, 2014. The trial court also found that, upon his release, Father "made some token visits with the [C]hild, according to testimony from Tamm[ie] Gentry, but did nothing in regard to completing the tasks on his Permanency Plan except complete the alcohol and drug assessment." The court found Father "abandoned the case proceedings and went to Virginia in April 2014" and stopped all communication with DCS until February 2015. In the interim, Father was incarcerated again. Once released, Father lived in a home that he admitted was not suitable for the Child. Gentry testified that during the relevant four-month period, DCS offered Father resources to take his alcohol and drug assessment, his mental health assessment, and random drug screens. DCS also facilitated visits between Father and the Child. The trial court further found DCS "made reasonable efforts to assist the parents in conducting child and family team meetings, bringing the matter before the Court for reviews, and maintaining an open line of communication for the [F]ather[.]" The evidence does not preponderate against these findings by the trial court.

Tenn. Code Ann. § 36-1-102(1)(A)(ii) addresses abandonment as a result of failure to provide a suitable home:

> [F]or a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . ha[s] made no reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that [the parent] will be able to provide a suitable home for the child at an early date. *The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal*, when the parent . . . is aware that the child is in the custody of the department.

8

(Emphasis added.) In the present action, the Child was taken into DCS custody on December 12, 2013. As a result, December 13, 2013 to April 12, 2014 is the four-month period we must examine to establish abandonment by failure to provide a suitable home.

As previously indicated, initially Father was unable to provide a home for the Child because of his incarceration. Once he was released, this part of the case did not improve. He still failed to obtain safe and stable housing suitable for the Child. By December 2014 – a year after the Child had been removed to State custody – Father moved into the home of his manager, who is identified elsewhere in the record as his girlfriend, and her two children. Trial testimony revealed her home was not suitable for the Child because of its size and because Father was essentially a guest there. Gentry explained at trial that DCS did not conduct a home study there because Father had told Gentry in April 2015 that the home was not appropriate. At trial, Father testified that he saved $900 for suitable housing, but that he had difficulty finding such housing because he is a felon.

We find that Father failed to establish a stable home and made no reasonable effort to do so. Further, his decision in April 2014 to abruptly leave the state without warning and cease communications with DCS for approximately ten months strongly "demonstrate[s] a lack of concern for the child to such a degree that it appears unlikely that [Father] will be able to provide a suitable home for the child at an early date." In Father's absence, Gentry testified that she attempted to contact him at his last known cell phone numbers, his last known employer, through his attorney, and at any additional phone numbers given to her by Father's attorney.

Father argues termination is not proper on the ground of "suitable housing" because, according to him, he did make reasonable efforts to obtain housing for the Child. In this connection, Father points out in his brief that, before trial, he bought a vehicle, paid for its registration, and paid to get a new driver's license. Father also testified that he held two jobs. Although Father made progress on some of the permanency plan requirements by the trial date, none of the efforts cited by him dealing with his vehicle are directly related to the concept of suitable housing for the Child. On the contrary, he has acted in a way that shows a lack of concern for the Child. During the relevant period, DCS made reasonable efforts to unite the family. In light of these facts, we hold, as a matter of law, that the evidence clearly and convincingly demonstrates Father abandoned the Child by failing to provide a suitable home.

As to Mother, the trial court found that the day the Child was taken into State custody, Mother was arrested and incarcerated for use of methamphetamines with the Child in her home. At the time of trial, Mother was still incarcerated and would be for at

9

least eight more months.  Further, the trial court found Mother's decision "to voluntarily remove herself from her inpatient rehabilitation and engage in illicit drug use after absconding . . . demonstrate[s] a lack of concern for the child to such a degree that it appears unlikely that [Mother] will be able to provide a suitable home for the child at an early date."  The trial court concluded that clear and convincing evidence exists to terminate Mother's parental rights on this ground.

Despite the trial court's holding, DCS concedes that it did not clearly and convincingly establish this ground against Mother.  DCS states that she was incarcerated during the relevant four-month period.  While incarcerated, she completed a mental health assessment and an alcohol and drug assessment and began inpatient treatment.  DCS stated that, "[g]iven the confines of her incarceration, there is little more effort she could have made during this period to remedy the drug issues which would make any home suitable."  In light of DCS's concession and supporting statements, we decline to find clear and convincing evidence to terminate Mother's parental rights on this ground.

**B.**

As to the ground of abandonment by an incarcerated parent by exhibiting a wanton disregard for the child, the trial court found clear and convincing evidence to terminate Mother and Father's parental rights to the Child on this ground.  "Abandonment" can occur when:

> A parent . . . is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration, or the parent . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv).  The trial court found that both Mother and Father were incarcerated during the four months prior to the date the Department filed the petition to terminate parental rights, March 27, 2015:

The minor child came into the custody of the Department on December 12, 2013. Based on stipulations by the [M]other, she was arrested on the date the [C]hild came into custody. She has been incarcerated or in an inpatient rehabilitation facility for the four (4) months preceding the filing of the Petition to Terminate Parental Rights, except from December 30, 2014 through January 16, 2015 when she had absconded from the inpatient facility and admittedly engaged in the use of cocaine and crack.

\* \* \*

The [F]ather was incarcerated for a portion of the four months preceding the filing of the Petition to Terminate Parental Rights. He was in jail from September until December 2014. The Petition was filed on March 27, 2015. Four months prior to the filing would have begun on November 27, 2014.

As to the determination of whether Mother and Father acted with a wanton disregard, the trial court concluded as follows:

[M]other's choice to leave the rehabilitation facility in December 2014, and engage in the use of cocaine and crack before turning herself in to authorities on January 16, 2015 occurred within the four (4) months preceding the filing of the Petition to Terminate Parental Rights. The choice by the [M]other to leave the court ordered inpatient rehabilitation facility on her own accord and engage in the use of cocaine and crack after making significant advances within the rehabilitation facility exhibited a wanton disregard for the welfare of the [C]hild.

\* \* \*

After the [F]ather was released from his incarceration, he did not re-establish contact with the Department until Feburary [sic] 2015. In addition, he abandoned the proceedings in this case in April 2014 when he left for Virginia and provided no contact information for the Department. In addition, the [F]ather admitted he knew a warrant was out for his arrest

11

when he went to Virginia. The abandonment of the case by the [F]ather after April 2014, and his failure to re-establish any contact with the Department until approximately two months after his release from incarceration exhibits a wanton disregard for the welfare of the [C]hild.

Finally, the stipulations of the parties with respect to their criminal adjudications prior to the removal of the [C]hild, and prior to their incarceration, reveal that both parents had convictions related to manufacturing of methamphetamine and promotion of the manufacture of methamphetamine. Convictions that exhibit a wanton disregard for the welfare of the [C]hild.

The evidence does not preponderate against the trial court's factual findings on this ground.

Although Tenn. Code Ann. § 36-1-102(1)(A)(iv) does not explicitly define wanton disregard, "[w]e have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 838 (citing *State Dep't of Children's Servs. v. J.M.F.,* No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7-8 (Tenn. Ct. App., filed Jan. 11, 2005), *perm. app. denied* (Tenn. Mar. 21, 2005)). "Parental conduct exhibiting wanton disregard for a child's welfare may occur at any time prior to incarceration and is not limited to acts occurring during the four-month period immediately preceding the parent's incarceration." *In re Kason C.*, No. M2013-02624-COA-R3-PT, 2014 WL 2768003, at *5 (Tenn. Ct. App., filed June 17, 2014) (quoting *State of Tenn., Dept. of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009)).

Mother argues that her relapse did not demonstrate a wanton disregard for the Child's welfare. She points out that she was assessed as being at a high risk for relapse. Prior to her relapse, she states that she made progress and abstained from using illegal drugs for about ten months. She acknowledges her relapse, but adds that she turned herself in and immediately sought out other treatment programs after she was precluded from re-joining the drug court program. She stated in her brief that her "actions demonstrate[ ] a personal struggle with addiction that Mother is sincerely working on[.]"

Mother admitted that methamphetamine was her "[d]rug of choice" for about three years, during which time she used it almost daily. She also admitted that before her December 2013 arrest, she used opiates, oxycodone, opana (oxymorphone), hydrocodone, and "pretty much any kind of pain pill." She estimates that, before her relapse, she last took drugs in jail in February 2014. These admissions indicate she abused drugs regularly throughout the Child's life and even after the Child was in State custody. Since the Child's birth, Mother has been convicted of violating the child restraint device statute, failing to stop at a stop sign, resisting arrest, child neglect, evading arrest, and two incidents of theft over $500. She was incarcerated from April to June 2013 and was on probation when she was arrested again in December 2013. Mother testified that prior to her December 2013 arrest, she "didn't feel like [she] had a problem" with methamphetamines and "thought [she] had it all under control." In the months that followed, Mother progressed in her drug treatment program. But despite those positive steps, she made the choice to leave her rehabilitation program in December 2014 and spend about two weeks abusing cocaine and crack.

All of these events occurred *prior to* her most recent period of incarceration, which began January 2015. "Our courts have consistently held that an incarcerated parent who has multiple drug offenses and wastes the opportunity to rehabilitate themselves by continuing to abuse drugs, resulting in revocation of their parole and reincarceration, constitutes abandonment of the child, and demonstrates a wanton disregard for the welfare of the child." *In re DNG*, No. M2003-02810-COA-R3-PT, 2004 WL 2314534, at *2 (Tenn. Ct. App., filed Oct. 13, 2004) (citing *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000)). The above incidents of long-time drug use, repeated criminal behavior, multiple incarcerations, and the decision to walk away from an opportunity to rehabilitate herself establish, by clear and convincing evidence, that Mother abandoned the Child by exhibiting a wanton disregard for the Child's welfare.

Father asks this court to reverse the trial court's finding on this ground as it relates to him. Father provided a pay stub indicating that $23.07 was garnished from his pay check issued on March 3, 2014. He also argues that the payment was not "token" because at that time he was only obligated to make a monthly payment of $50. Father points out that he visited the child three times in March 2014, once in April 2014, three times in May 2015, and twice in June 2015.

Father was incarcerated within the four months prior to the time DCS filed the petition. His incarceration, then, is a "triggering mechanism that allows the court to take a closer look at the [C]hild's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the [C]hild." *In re Audrey S.*,

182 S.W.3d at 866. As we stated earlier in this section, for this ground, we are not limited to considering Father's actions in the four months prior to his incarceration or the date DCS filed its petition. *In re Kason C.*, 2014 WL 2768003, at *5. Tenn. Code Ann. § 36-1-102(1)(A)(iv) requires us to consider whether "the parent . . . has engaged in conduct *prior to incarceration* that exhibits a wanton disregard for the welfare of the child[.]" (Emphasis added.) Therefore, for this ground, we will consider Father's conduct prior to his most recent incarceration, which began in September 2014. Accordingly, unlike the trial court, for this ground we will not rely on Father's delay in contacting DCS after he was released from incarceration.

Prior to Father's September 2014 incarceration, he was convicted for promotion and manufacture of methamphetamines and was incarcerated when the Child was taken into State custody. In April 2014, he stopped communicating with DCS for about ten months. He violated his parole and was incarcerated again. He had not visited the Child for five months at the time of his last arrest, though he had attended some visits prior to falling out of contact. He states, in part, that he did not visit the Child in those months because he knew he had a warrant out for his arrest. Despite his knowledge of the warrant, he left the state. Father had been ordered to pay $50 each month in child support payments. He testified that as long as he was working at Burger King, he was paying support. According to Father's testimony, April 9, 2014 is the last date he specifically stated that he worked at Burger King before going to Virginia. The trial court concluded he made no support payments between April and September 2014. Based on his testimony, we find he made no more payments during those months than the amount garnished from his compensation from Burger King for work done at the beginning of April.

"The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App., filed June 9, 2015). As we stated earlier, "[i]t is well established that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the child's welfare." *In re N.J.S.*, No. M2008-01694-COA-R3-PT, 2009 WL 2215004, at *4 (Tenn. Ct. App., filed July 24, 2009) (citing *In re Audrey S.*, 182 S.W.3d at 868). Father violated his probation, was in and out of jail, took part in criminal behavior involving illegal drugs, and did not visit or provide adequate support to the Child for months prior to being incarcerated in September 2014. Further, the facts indicate Father's indifference to the consequences for

14

the Child. For the above reasons, we hold, by clear and convincing evidence, Father abandoned the Child by acting with a wanton disregard.

## C.

The trial court found clear and convincing evidence to terminate each parent's parental rights under Tenn. Code Ann. § 36-1-113(g)(2) for substantial noncompliance with the permanency plan, despite DCS's reasonable efforts to assist them. The trial court found DCS created permanency plans for Mother and Father when the Child was in State custody. The first permanency hearing occurred on January 14, 2014, and the same day a family permanency plan was ratified by the Court. The trial court stated the goals for that plan: "the mother and father were required to have a mental health assessment and follow recommendations; alcohol and drug assessment, and follow recommendations; drug screens; parenting classes; visitation; child support; stable income; transportation; stable housing; comply with probation and resolve all legal issues." The court also found Father was required to complete anger management classes. The trial court stated a subsequent permanency hearing occurred June 17, 2014 and another permanency plan was ratified by the court. We add that the record also includes a third permanency plan, which was ratified on December 9, 2014. The court found the obligations of the permanency plans remained the same throughout the case.

To establish substantial noncompliance, the trial court must first find "that the requirements of the permanency plans are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re Deashon A.C.*, No. E2009-01633-COA-R3-PT, 2010 WL 1241555, at \*5 (Tenn. Ct. App., filed Mar. 31, 2010) (citing *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004)). Mother asserts that the trial court made no such finding. In the permanency hearing orders, the trial court found the requirements to be "reasonable, related to remedying the conditions that necessitate foster care, and in the [Child's] best interest." The orders were entered into evidence at trial. However, the trial court's final order does not specifically address the reasonableness of the responsibilities in the plan. If a trial court does not make such a finding, then the appellate court reviews the issue de novo. *In re Deashon A.C.*, 2010 WL 1241555, at \*5 (citing *In re Valentine*, 79 S.W.3d at 547).

The State's petition for temporary legal custody and ex parte order, filed December 16, 2013, stated DCS had received a referral that the Child and Mother were living in a home where methamphetamine was being manufactured and that Mother was using the drug in front of the Child. The home in question was "a broken down motor home" whose "occupant" let Mother and the Child stay there, according to the petition.

15

The petition stated that "the area surrounding the home is cluttered with trash" and two bottles of muriatic acid were found underneath the motor home. The motor home did "not have water or a working toilet" and instead, "[t]he occupants use the restroom in a bucket," according to the petition. Mother later testified at trial that she chose to reside there because she knew there was a warrant for her arrest and the secluded motor home would be "a good place to hide for a while." The petition states that Mother admitted her use of methamphetamine to DCS and that she "was arrested by law enforcement for [an] active warrant in Blount County." At the time, Father was also incarcerated due to methamphetamine.

Previously, we have found that "[r]equirements that a parent desist from the use of drugs, complete substance abuse assessments, and follow resulting drug treatment recommendations are justified for the purpose of creating a safe and nurturing environment for a child." *In re Deashon A.C.*, 2010 WL 1241555, at *6 (citations omitted). The first permanency plan was first ratified just weeks after the Child was removed. It required Mother and Father to have a mental health assessment and follow the recommendations; be drug free for a minimum of four months; have a drug and alcohol assessment and follow the recommendations; submit to drug screens; complete parenting classes; attend visitation with the child; pay $50 per month in child support; provide proof of legal source of income and have financial ability to care for the Child; obtain transportation by providing a transportation plan, proof of car insurance, and proof of car purchase; have a clean home free of safety hazards for a minimum of four months; comply with probation and refrain from illegal activities; and attend half of the Child's appointments once released from jail and show an understanding of where the Child is developmentally. As to Mother, the requirements of the permanency plan are "reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *Id.* at *5.

With regard to Mother, the trial court found she "was doing well in the inpatient facility" and had advanced through two of the four phases of treatment, but that this changed when she left the facility December 30, 2014. Based on Mother's own testimony "her first night away from the facility, she drank beer. The third day away she used cocaine, and thereafter she smoked crack every day until she turned herself in[.]" Testimony at trial revealed that "[M]other's location was unknown to authorities until she turned herself in on January 16, 2015." The trial court acknowledged that Mother completed her mental health assessment in March 2014 and received her GED in October 2014, as was recommended by the mental health assessment. However, the trial court also found that at the time of trial, Mother was "still incarcerated, has no job, did not complete [inpatient] rehabilitation, has no suitable housing, no transportation, has paid no

child support, and has not visited with the [C]hild since December 2014." The trial court held that this amounts to substantial noncompliance.

The evidence recited does not preponderate against the trial court's findings of fact. However, we also find that in late July 2015, Mother began working five days a week without compensation, performing janitorial services at the Juvenile Court. Since her December 2013 arrest, she had no income to make support payments. Gentry verified Mother's assertion that Mother attended all five scheduled visitations with the Child prior to her relapse, and further contacted the Child through letters. Mother was first able to visit the Child May 12, 2014 and last saw the Child in December 2014. After her relapse, Mother made efforts to get back on track with the permanency plan. She requested to be placed back in the inpatient treatment program she had abandoned, but was denied. She testified that she applied to go to a work camp in Johnson City for the opportunity to work and be in a structured environment, which Mother said she needs. Before DCS filed the termination petition March 27, 2015, Mother began and completed parenting classes and a forty-five day drug treatment program. She testified that on July 17, 2015, she began attending weekly, one-hour sessions about coping with addiction.

On the topic of substantial noncompliance, the Supreme Court has previously explained:

> Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. *Black's Law Dictionary* defines "substantial" as "[o]f real worth and importance." *Black's Law Dictionary* 1428 (6th ed. 1990). *In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to the requirement*.

*In re Valentine*, 79 S.W.3d at 548 (emphasis added). Primarily, the State removed the Child due to Mother's illegal drug use and failure to provide a suitable home. Therefore, we must give greater weight to the requirements that Mother follow the recommendations of her alcohol and drug assessment, resolve all legal issues, and obtain a stable home. We find it significant that Mother did not complete her inpatient drug treatment and, for a time, returned to using illegal drugs. Her actions violated her probation and led to her re-incarceration, which in turn affected her ability to obtain employment and transportation, maintain visitation, and establish a stable home. Failing to complete her inpatient

treatment was not a "minor, trivial, or technical deviation[ ] from a permanency plan." *State Dep't of Children's Servs. v. A.M.H.*, 198 S.W.3d 757, 765 (Tenn. Ct. App. 2006) (citing *In re M.J.B.*, 140 S.W.3d at 655-57). We find by clear and convincing evidence that Mother's noncompliance with the permanency plan was substantial.

With regard to Father, the permanency plans assigned him the same responsibilities assigned to Mother, but, in addition, the trial court states he was required to complete anger management classes. It is unclear from the record why Father was given this additional responsibility. The permanency plan states, in part, the related "concern" is Father's history of not working with DCS. In the January 14, 2014 permanency hearing order, the trial court removed anger management as an "action step" for Father unless it is recommended by his mental health assessment. Father's mental health assessment did not recommend anger management classes. At the time the Child was removed, Father was incarcerated for production of methamphetamine and unable to provide a suitable home for the Child. While we find all other responsibilities in the permanency plan are reasonable and related, we cannot conclude the same for the anger management requirement. "Noncompliance with requirements in a permanency plan that are neither reasonable nor related to remedying the conditions that led to the removal of the child from the parent's custody is not substantial noncompliance for the purpose of Tenn. Code Ann. § 36-1-113(g)(2)." *In re Z.J.S.*, 2003 WL 21266854, at *12 (citing *In re Valentine*, 79 S.W.3d at 548-49).

For Father, the trial court based its holding on (1) Father's failure to visit the Child from April 2014 to February 2015; (2) his noncompliance with his probation; (3) his September 2014 incarceration; and (4) Gentry's testimony that Father did not have stable housing, transportation, or income prior to the time DCS filed its petition. As of the date of the hearing, the trial court found, through both Gentry and Father's testimony, that Father "had not completed his individual therapy as recommended by his mental health assessment, had not completed his parenting classes and still did not have a suitable home for the [C]hild as of the date of the hearing." The trial court further found Father did not start his individual therapy and parenting classes "until August of 2015, some five months after the filing of the Petition to Terminate." The evidence does not preponderate against the court's factual findings on this ground.

Father completed some of the reasonable and relevant responsibilities assigned to him. In March 2014, he underwent a mental health assessment, a drug and alcohol assessment, and a drug screen. In the months before trial, Father earned a stable income. Just after DCS filed the termination petition, Father obtained transportation. He partially complied with several other responsibilities. Based on the pay stubs Father submitted as evidence at trial, he had paid $23.07 in support payments for the Child by the time DCS

filed its petition. The amount had been garnished from his March 3, 2015 paycheck of $371.13. According to Father's testimony, he paid no rent at that time. In 2015, Father took a second job where none of his wages were garnished. Father submitted his pay stubs showing that by the time of trial $125.35 had been garnished. It is unclear how much child support Father paid before March 3, 2015. We find Father paid only part of the $50 monthly payments required while the Child was in custody, despite his own statements that he worked regularly. Father's visits with the Child also were inconsistent. He visited somewhat regularly in 2014, fell out of contact for about ten months, and then resumed regular visits in the spring of 2015. By the time DCS filed the termination petition, he had visited the Child only twice since April 2014. The Child had been in custody since December 2013 before the August 2015 trial. In half of those months, Father made no visits at all. As for the remaining requirements, he did not obtain a stable home, despite testifying that he saved money for housing. He partially complied with recommendations from his mental health assessment in that he began parenting classes and individual therapy just before trial, but failed to make any progress toward his GED. He had begun parenting classes in 2014 before falling out of contact, but did not complete them. He also did not comply with his probation and was incarcerated again.

Father argues termination is improper on this ground because "the record indicates that . . . by the time of trial, [F]ather had either completed or began much of what was asked of him." But Father failed to complete some of the most significant requirements in the permanency plan, namely, to obtain stable housing, comply with his probation, and resolve his legal issues. Father did very little to maintain a relationship with the Child in that he failed to consistently provide support or visit, including a ten-month period in which he had no contact with DCS. We are not persuaded by his last-minute efforts just before trial to begin parenting classes and individual therapy. We agree with DCS that those efforts "do not excuse [Father's] year-and-a-half of inaction." Previously, this court has found clear and convincing evidence to terminate parental rights on this ground when the parent's "efforts to comply were sporadic, inconsistent and not substantial." *State, Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 294 (Tenn. Ct. App. 2006). We find clear and convincing evidence that Father failed to substantially comply with the permanency plan, such that termination is proper for this ground.

## D.

Finally, the trial court relied on the following facts in holding that clear and convincing evidence exists to terminate each parent's rights based on persistence of conditions:

The [C]hild has been removed from the custody of the parents for more than 20 months. The [M]other is still incarcerated. The only time she was not incarcerated or in an inpatient rehabilitation facility, she relapsed and used cocaine and crack. At the time of removal, the [M]other was arrested and later convicted of charges for conspiracy to manufacture methamphetamine. The [M]other is still incarcerated, does not have a suitable home for the child and is not eligible for parole for at least eight (8) more months.

The [F]ather was incarcerated at the time the [C]hild was removed from his custody, and could not provide a suitable home for his [C]hild. Although he is no longer incarcerated, he is still on parole, and by his own admission does not have a suitable home for his [C]hild. In fact, he testified that it is difficult for him to find a home as a convicted felon.

This Court can conclude by clear and convincing evidence that the conditions that led to the removal of the minor [C]hild from the [M]other and [F]ather still persist and are unlikely to be remedied at an early date so that the [C]hild may be safely returned to the parents. Furthermore, [DCS Foster Care Worker] Caitlyn Sneed testified that the minor [C]hild is now in a preadoptive home. She has been there for four to five months, and has bonded well with the pre-adoptive parents. Therefore, this Court concludes by clear and convincing evidence that continuation of the parent child relationship greatly diminishes the chances of the minor child's integration into a safe, stable and permanent home.

After reviewing the record in this case, we hold that the evidence does not preponderate against the trial court's factual findings on this ground. Tenn. Code Ann. § 36-1-113(g) authorizes termination of parental rights when:

(3) The child has been removed from the home of the parent . . . by order of a court for a period of six (6) months and:

(A) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to

20

be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) . . . still persist;

(B)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) . . . in the near future; and

(C)  The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

"The failure to remedy the conditions which led to the removal need not be willful." *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (citations omitted). "A parent's continued inability to provide fundamental care to a child . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Dakota C.R.*, 404 S.W.3d 484, 499 (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App., filed Oct. 13, 2008)). Persistence of conditions are not limited to the conditions that brought about a child's removal from the home, but also may include "other conditions that would probably cause the child to be subjected to neglect should the child be returned to the parent[.]" *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App., filed Mar. 3, 2008).

As we have stated, Mother made progress on her initial treatment. At the time of trial she was twenty-four years old. She testified that she has done "pills on and off since [she] was about [twelve] years old." She also testified to using methamphetamines for three years, as "usually . . . an every day thing." She did not "feel like [she] had a problem" until her arrest in December 2013, according to her testimony. She testified that, at the time of trial, she had not used drugs since January 2015. Still, she was incarcerated on both the day the Child entered State custody and the day of the termination hearing. Her incarceration was prolonged solely because of her relapse. In 2014, Mother was out of jail and had an opportunity to complete inpatient treatment for substance abuse. Instead, she abandoned the treatment program before completing it and resumed the daily use of illegal drugs for about two weeks straight. Her decision also prevented her from providing a suitable home for the Child. Mother stated she was assessed as "a high risk for relapse." Despite progress, conditions persist that "prevent the child's safe return to the care of the [Mother]," and we find "little likelihood that these conditions will be remedied at an early date." Tenn. Code Ann. § 36-1-

113(g)(3)(i)-(ii). The Child is in a pre-adoptive home, and her "chances of early integration into a safe, stable and permanent home" would be lessened by continuing the relationship between Mother and the Child. Tenn. Code Ann. § 36-1-113(g)(iii). For these reasons, we find, as a matter of law, clear and convincing evidence to terminate Mother's parental rights on this ground.

For Father, the conditions that led to the Child's removal have persisted. While the Child was in State custody, Father violated his probation and returned to jail. He paid little support and showed a lack of concern for the Child by ceasing communication with DCS for ten months and inconsistently making support payments. Even months after his release from incarceration, he still failed to provide a suitable home for the Child. Conditions persist that "prevent the child's safe return to the care of the [Father]," and we find "little likelihood that these conditions will be remedied at an early date." Tenn. Code Ann. § 36-1-113(g)(3)(i)-(ii). Father has had months to provide a home for the Child and he had failed to do so. Just as with regard to Mother, the Child's "chances of early integration into a safe, stable and permanent home" would be lessened by continuing the relationship between Father and the Child. Tenn. Code Ann. § 36-1-113(g)(iii). For these reasons, we find, as a matter of law, clear and convincing evidence to terminate Father's parental rights on this ground.

## VII.

After finding that there are statutory grounds warranting termination of both Mother's and Father's parental rights, we now focus on whether termination is in the Child's best interest. When considering the issue of "best interest," we are guided by the following statutory factors set forth in Tenn. Code Ann. § 36-1-113(i), which provides:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interests to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social

22

services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The above list is not exhaustive[,] and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." *State Dep't of Children's Servs. v. B.J.N.*, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing *State Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at \*9 (Tenn. Ct. App., filed Sept. 15, 2006)). In addition, "[t]he child's best interest must be viewed from the child's, rather than the

parent's, perspective." ***In re Marr***, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005) (citing ***White v. Moody***, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

In the present action, the trial court's September 15, 2015 order terminating the parental rights of Mother and Father found, by clear and convincing evidence, that termination of their parental rights was in the best interest of the Child. The trial court based this decision with regard to Mother on the fact that in the time the Child has been in State custody, Mother has not maintained regular visitation, failed to complete her inpatient rehabilitation program, and relapsed to using drugs. Based on this, the trial court found that "[t]o return the [C]hild to the custody of the [M]other would place the [C]hild in an unsafe environment leading to further neglect or abuse of the [C]hild."

With regard to Father, the trial court found he was unable to provide a suitable home for or parent the Child at the time the Child was taken into State custody due to his incarceration for drug charges. Even after his release from prison, Father was still largely unavailable to parent the Child, due to Father's ten-month absence. The trial court also relied on Father's probation violation and reincarceration. At the time of trial, Father still did not have a suitable home for the Child. He lives in his manager's home, where he is not on the lease and does not pay rent. The court held that "[t]o return the [C]hild to his custody would place the [C]hild in an unsafe environment leading to further neglect."

As to the Child's current placement, the trial court found that she was currently placed in a pre-adoptive home and had been there for four to five months. The trial court found that the foster parents are married with three other children, have a home of adequate size, and earn an appropriate income to provide for the Child. The court also noted Sneed's testimony that the Child had bonded well with the foster parents and that the foster parents take the Child to school and doctors' appointments. In comparison, the trial court stated that Father has not asked to attend the Child's doctor's appointments, nor does he know what activities the Child is involved in or who the Child's doctor is. The evidence does not preponderate against the trial court's findings of fact with regard to best interest. Given these facts, the trial court concluded that it is in the best interest of the Child to terminate Mother and Father's parental rights "to allow the [C]hild to integrate into a safe, stable and permanent home." We find, as a matter of law, clear and convincing evidence that it is in the Child's best interest to terminate the parental rights of Mother and Father.

By the time of trial, Mother had not "made such an adjustment of circumstance, conduct or conditions." Mother has worked toward her treatment goals. Before her first relapse, she had abstained from illegal drugs for approximately ten months. At trial, she testified that she had again gone several months without using illegal drugs, stating that

24

she last used in January 2015. While Mother has made progress, she stated in her brief that she is at a high risk for relapse. During her last relapse, she used cocaine and smoked crack daily for about two weeks straight. She has not changed her conditions such that it would be safe for the Child to be in the home with her. Further, she was still incarcerated at the time of trial and cannot provide a suitable home. She remains at a high risk of relapse and never completed the inpatient treatment recommended for her. Therefore, despite her progress, Mother has not shown that she has made a lasting adjustment in her circumstances, despite the reasonable efforts of DCS to work with her to develop a permanency plan, maintain a relationship with the Child, get the assessment she needs for mental health and her substance abuse, and receive needed treatment. "Expecting a young child to wait years on incarcerated parents to remedy their problems is neither reasonable nor in the best interests of the child." *In re DNG*, 2004 WL 2314534, at *3 (citing *In re Shipley*, 1997 WL 596281 (Tenn. Ct. App., filed Sept. 29, 1997)).

Father also has not made an adjustment to his circumstances or conduct. While the Child was in State custody, he was incarcerated, violated his probation, and was not consistently available to parent the Child. Despite available assistance from DCS, he waited more than a year to begin the individual therapy that was recommended to him following the mental health assessment. Father went ten months without seeing the Child and voluntarily failed to contact DCS during that period. He never obtained a stable home and he has been inconsistent with Child support payments.

As for the Child, she entered State custody when she was two years old. Before her relapse, Mother attempted to maintain regular visitation or contact with the Child. When the two visited, Gentry testified that the Child was excited to see Mother. As Gentry described it, "I don't know that I would say it was a bond, but it was a beginning relationship." All this changed after Mother's relapse. In 2015, she took steps to set up visitation, but as of the date of trial had not visited the child since December 2014.

After Father's ten-month absence, DCS facilitated "therapeutic visitation so as not to traumatize the [C]hild since he hadn't seen her in so long," according to Sneed's testimony. At trial, Father did not know details about the Child's doctors or activities.

"[T]he best interest of the child remains the paramount and utmost consideration; it is the polestar, the alpha and omega in the court's determination." *In re DNG*, 2004 WL 2314534, at *3 (citing *Arnold v. Arnold*, 774 S.W.2d 613, 621 (Tenn. Ct. App. 1989)). Here, the Child is doing well in her current placement. Sneed testified that the Child gets along well with the other children in the home. Sneed described the Child as "very bonded" with the pre-adoptive family. She also testified that family's home has

25

passed a DCS home study. Accordingly, we conclude, as a matter of law, that the trial court was correct in holding that there is clear and convincing evidence that termination of Mother and Father's parental rights is in the Child's best interest.

## VIII.

The judgment of the trial court is modified so as to exclude from the holding that Mother abandoned the Child for failure to provide a suitable home. As to Father, the judgment of the trial court is modified to exclude consideration of Father's delay in contacting DCS after his release from incarceration in December 2014 in holding that Father abandoned the Child by acting with a wanton disregard for the Child's welfare.

## IX.

The judgment of the trial court is affirmed as modified. The costs on appeal are assessed to the appellants, Mother and Father. This case is remanded for enforcement of the trial court's judgment and for collection of costs assessed by the trial court.


_____
CHARLES D. SUSANO, JR., JUDGE